## Case No. 13,576.

STURGIS v. The JOSEPH JOHNSON.

[26 Betts, D. C. MS. 10; 19 How. Pr. 229.] [1]

District Court, S. D. New York. June, 1860.

WHAT ARE SALVAGE SERVICES—TOWING DISABLED VESSEL—COMPENSATION—USAGE.

[1. The services rendered by a tug in towing into New York harbor. under circumstances involving no special danger to lives or property, a steamer whose machinery was disabled by a collision, and which was drifting out to sea in a storm, *held* a salvage service, but not of any extraordinary merit. for which $1,000 was sufficient compensation. the time employed being but four or five hours.]

[2. There is no custom or usage of binding obligation whereby steam-tugs in New York harbor are obliged to render towage services to each other without compensation, when found disabled and in need of assistance within their common field of employment.]

[3. The value of a tug which is constructed and maintained for the purpose of rendering aid to vessels in distress is not a controlling element in determining the amount of a salvage award. where she was not sent for because of her great power or special adaptation for the purpose required, but where. in the usual course of her business, she offered her services to a disabled vessel, which might have been equally well served by other vessels of less power.]

[This was a libel by Russell Sturgis, owner of the steam tug Achilles, against the steam-

boat Joseph Johnson (John A. Parks. claimant), to recover compensation for alleged salvage services.]

BETTS, District Judge. On the 10th of March, 1855, at nine or ten o'clock in the morning, the steam tug Achilles came up to and·spoke the steamboat Joseph Johnson in a disabled condition adrift at sea, several miles south east of Sandy Hook point, and five or ten miles off from the Jersey beach or shore, and inquired whether she required assistance. A reply was given from the steamboat to the effect that she wanted help, but that her master was then on board a schooner in sight, four or five miles off, and the tug was requested to go to the schooner and get the captain of the steamboat from her, and return with him to the steamboat. This was done in about an hour, and on the return of the tug back with the master of the disabled steamboat, a hawser was passed from the tug to the steamer, secured to the latter, and she was taken in tow, and carried by the tug ·to her wharf in New York within a period of four to five hours from the time the tug returned to her, without further loss or damage of consequence to either vessel.

The tug was a vessel·of great strength and steam power. She had cost about $46,000, and was built for and employed in the business of towing vessels from and into New York and giving them aid in distress in this port and off this coast when required. The steamboat Joseph Johnson was also a steam vessel engaged in the same employment on this station, but of much less force and value .than the Achilles, and estimated by the proof to be before her accident on this occasion worth from seven to twelve· thousand dollars. On the evening previous to the 9th of March the Johnson and schooner Henrico met off the Jersey shore below Sandy Hook, going in opposite directions; and a collision occurred between them in which the steamboat was seriously injured; and both vessels, after getting extricated from each other, anchored for the night from one-half a mile to a mile from the shore. The smoke pipe of the steamboat was carried away, and also some of the wheel arms and buckets of one of her wheel houses. and part of the same wheel house, and one end of her main shaft was thrown out of its bed. The bowsprit was broken off, and some damage done to the upper joiner work. She was disabled from using her steam power, and was left in an unmanageable condition. During the night she and the schooner commenced drifting out to sea, the Johnson dragging her anchor, and had got nearly into deep water, and out of the control of the anchor. The schooner's cable had parted, and she had drifted four or five miles farther out to sea than the Johnson at the time the Achilles came up ·to them. When the vessels separated, after the collision, the master of the steam-

---

[1] [19 How. Prac. 229, contains only a partial report.]

boat and one of her firemen remained on board the schooner. The wind was blowing fresh off shore N. W. or N. of W. at the collision, and continued in that direction during the night, and also the next day, when the two vessels were discovered by the Achilles, and she went to them. The state of the wind and of the weather during the preceding time, and whilst the Johnson was in tow of the Achilles, as well as the peril of the Johnson, and the difficulties or danger to the Achilles in getting to and towing her, are subjects of irreconcilable and mere differences of opinion between the witnesses in the cause. The depositions of twenty-one witnesses have been read in the cause, exhibiting in a marked manner the discrepancies of opinions and statements usually accompanying narratives of sea services, especially of a salvage or collision character, in which the parties testifying have personally participated or are specially concerned in interest or feeling. I do not deem it important to rehearse this evidence at large, or dissect or compress it in explanation or support of the grounds upon which the decision in this case is founded.

The defence to the demand of a salvage reward made in the libel is placed by the claimant upon three propositions: (1) That the service rendered by the Achilles was one of towage merely, if at all entitled to compensation; (2) that the reward was limited to $150 or $200, by agreement with the officers of the Achilles, provided her owner, when consulted, should require any pay; and (3) that, by the usage and custom of this port, steam tugs render gratuitously aid and assistance in towing each other reciprocally within the harbor in case of being disabled or injured in pursuing their business in this port.

On the part of the libellant the claim is pressed as a salvage service of eminent merit and peril, and deserving an exemplary reward. I think, according to the clear doctrine of the law maritime, the services rendered in this case were of a salvage character, and that the libellant is entitled to compensation for them upon that principle. A reference to a few leading authorities, it appears to me, demonstrates this point. Dr. Lushington, in one of the most recent cases, remarks, in respect to the distinction between a salvage and towage service and the claims of a steamship which had performed a service to a vessel disabled and in distress, that "taking her in tow cannot by possibility be compared to an ordinary towage service." The Charles Adolphe, Swab. 153. In that case the steam vessel came in aid of the salved vessel when in the hands of a first class of salvors, and only aided in towing her a short distance, but that was held to be clearly a salvage service by the steamer.

So Lord Stowell, in the first case before him of a claim to salvage for towage by a steam packet, awarded a salvage compensation to her for towing a vessel in a situation of apprehension, though not of actual danger, chiefly upon considerations of public policy in encouraging vessels of that description to render themselves to the assistance of vessels in distress. The Raiker, 1 Hagg. Adm. 246. And it appears that a salvage reward will be allowed for towage by a steamer when her services are accepted, but not called for by a sailing vessel where the towage is a long distance or under circumstances of high advantage to the vessel towed. The Meg Merrilies, 3 Hagg. Adm. 346, and note. And, since the doctrine has been thus introduced and recognized, cases have largely multiplied in the English and American courts in which salvage rewards have been allowed to steamers specially called on, coming casually to the relief of vessels stranded or in want of assistance at sea as if allotted to the business of towage or wrecking as a stated employment; and the question of jurisdiction over the claim is not made to depend upon the circumstances that the service of a steamer is indispensable or critical in this particular instance, or whether in its performance any thing more is done by the steamer than to apply her functions in towage of the vessel relieved. The Versailles [Case No. 6,365]; The Independence [Id. 7,-014]; The Reward, 1 W. Rob. Adm. 174; Marv. Wreck & Salv. c. 15.

The question of jurisdiction over the subject-matter in the admiralty courts is one independent and distinct from that of the quantity of merits or reward. I am clearly of opinion, therefore, that the defence offered in law to the action that the libellant does not establish a case of salvage, but only one of quantum meruit pro opere et labore, and that of a very humble character, is not maintainable, and that the libellant is entitled to compensation as a salvor. I think, also, the other branches of the defence are equally untenable. The evidence offered by the claimant of the Joseph Johnson to prove an agreement by the officers of the Achilles to perform the service for a sum not exceeding $150 or $200 is met and repelled by a superior weight of testimony on the part of the libellant. The court cannot fail to discern that each class of witnesses is subject to inferences which naturally conduce to give a strong coloring and bias to the opinions or impressions formed by them respecting the occurrences which took place, and particularly in regard to declarations or admissions stated to have been made upon the one side or the other; but, to my judgment, the fair and natural conclusion from the depositions as a whole is that no bargain or understanding existed between the parties as to the price or sum for which the Achilles undertook the relief of the Joseph Johnson. And much less is there any satisfactory foundation in the proofs for the last point of defence that, by custom and usage

in this port, this class of steam vessels engaged in towing vessels to and from sea or about the harbor are bound to relieve each other by gratuitous towage, whenever they may be found disabled, and requiring assistance within their common field of employment. Very probably, individual instances exist where the service has been rendered without charge, but no obligation of law is shown which exacts it as a right due to one strange vessel from another. If it assumes in any contingency the aspect of a right or privilege, it is one of imperfect obligation, and out of the cognizance of courts of justice.

Great efforts have been put forth on the part of the libellant to enhance the service rendered in this case to one of extraordinary merit and value. The peril of this undertaking by the Achilles is represented as imminent on account of the violence of a gale prevailing at the time, the hazard of closing with the Johnson to attempt her relief, and that the exposure of the Joseph Johnson to founder immediately or be driven to sea without hope of rescue to her or her crew, unless instantly relieved, was such that the interposition of the Achilles must be regarded by the court as the sole means of the preservation of the ship and the lives of those on board her. Representations of this character cannot fail to create embarrassments in the minds of those to whom they are addressed and who are required to act under their influence without the advantage of experience to aid in rectifying exaggerations which might be palpable to nautical men. Judges of admiralty courts are especially exposed to misapprehensions and misjudgments in dealing with subjects foreign to their personal experiences, and relating to incidents well calculated to bear a semblance of deeper importance than intrinsically belong to them, and are, besides, given in evidence by witnesses whose opinions and conclusions the judges cannot be supposed to appreciate or scrutinize with reliable justness and accuracy. The English admiralty judges acknowledge feelingly the perplexities presented by this description of cases, although their duties are relieved and largely corrected by the aid of nautical assistants (The Princess Alice, 3 W. Rob. Adm. 138); and those called to administer the maritime law in the American courts have not that auxiliary to lean upon as a guide to their decisions. I do not propose to scan the voluminous depositions in this cause in verification of this criticism upon its complexion. Suffice it to say that it is as variant and clashing respecting the state of the weather and the peril and meritoriousness of the services rendered as the imagination of the witnesses and their power of expression could well be supposed capable of picturing. The endeavor of the court will be to estimate the subject upon the facts explicitly proved with very limited and guarded reliance upon the coloring given by the respective witnesses to their mere opinions and impressions. I think, then, if the case proved amounts to more than a mere technical salvage, he should also be rewarded in a degree with a view to considerations of public policy, and a due encouragement to steam tugs to offer themselves promptly for the relief of vessels disabled and in danger within the route of their usual employment.

The Joseph Johnson was adrift and totally unmanageable, with a strong wind blowing off shore, when approached by the Achilles. She was in sight of the shore in full daylight, off the mouth of her home port, and in the path of numerous vessels of all denominations passing in and out the harbor day and night, and many of them devoted to the business of searching for and aiding others requiring assistance. Such at the time was the situation. She and her colleague, of like force, were both outside the Hook and along the shore, in pursuit of that description of business. This was withdrawing her from a condition of hopeless destruction as if overcome by her disaster in a remote part of the world, and no means of rescue to look for other than what she was able to supply within herself. Her hull was also sound, and she was in no immediate peril of foundering because of any inability of withstanding the ordinary action of the waves. She was only deprived of self-moving power. This was manifested on her examination after arrival in port. Now, looking to the facts alone attending the action of the Achilles, do they in their naked bearing indicate anything beyond a prompt and skilful application of the capacity of the ship to the service sought to be performed, and that too without any manifestation at the time by her master or pilot in their acts that her undertaking was extraordinarily perilous to her or of imminent necessity to the Joseph Johnson? Without insisting upon taking instant hold of the latter, and urging the hazard of delay, she went off without objection by her master or pilot a distance of 4 or 5 miles to the schooner Henrico, and expended an hour in getting from on board her the master of the Joseph Johnson, and bringing him back to his vessel, and then, in his presence and apparent concurrence, threw a hawser to the Johnson, and proceeded directly into the harbor with their tow. There was no exhibition by the salvors of any apprehension of immediate peril to the tow or the Achilles in the operation, or that the exigencies of the Johnson demanded special activity or precautions. The state of the Johnson was unquestionably one of danger, and constituted the interposition and recovery by the Achilles an act of salvage, but no way attended with circumstances of extraordinary meritoriousness in personal efforts or exposure of life or property by the salvors.

The demand of a moiety of the value of the Johnson, as a meet reward for the assistance

afforded her, seems to me founded upon the highly wrongful representations of the state of the wind and the sea, and upon possible exposures which might have resulted to the Achilles from those causes, more than upon clear proof of acts of actual necessity and peril performed by the salvors; and that the ingredient in the service set forth as the commanding one entitling the libellant to an extraordinary rate of compensation is the value of the Achilles, and the merit of her owner in devcting her to this description of employment. Had the Achilles been sought for and engaged in this service by the Johnson because of her superior strength and power and ability to give assistance which a vessel of inferior force could not supply, no doubt her owner might properly avail himself of such fact to enhance his reward. Lord Stowell remarks upon the effect facts of that character may fitly have in fixing the reward to be awarded a steamship, leaving her harbor to fulfill a call of that character. He allowed her £200 for going from Dover to the Downs, and remaining with the vessel, watching her all night, towing her the next day to Ramsgate (a distance, as far as can be computed from a map of small scale, about equal to the towage of the Joseph Johnson). The ship had been aground, and was worth £12,500. But I do not perceive that the consideration of the value of a tug ccnstructed and actually pursuing this very business can justly be made a controlling element in estimating her services when she has not been sent for because of that particular quality, nor was it shown to be indispensable to enable her to render the relief she afforded. She is rather to be regarded as in the market seeking that class of business with other competitors upon the recommendation of her superior qualities. She derives her encouragement and profits in the market from the reputation of her higher qualifications for the service. When, then, in her ordinary routine of seeking business, she undertakes the aid of a crippled vessel, I can perceive no principle of law which entitles to a quantum meruit for this particular greater than would be earned by her if worth less than half her cost to her, providing she was, notwithstanding such value, able to perform the work. Had the steamship Vanderbilt or Persia or Adriatic chanced to have fallen in with the Joseph Johnson, and given the same assistance afforded by the Achilles, I cannot suppose any court would measure the amount of compensation to either of those liners beyond what would be a competent reward to the Achilles for the same service, it being within the scope of her ability to perform equally well, when they were not required to go out specially to render the aid, and were not sought to give it because of their extraordinary power and capacity.

I think, on the facts before the court, one thousand dollars is an adequate reward for the salvage service rendered in this case, and direct a decree to be entered in favor of the libellant for that sum, with costs to be taxed.

[The cause came again before the court on the question of attorney's fees. Case No. 13,576a.]